THE LADY PALMERSTON.

(District Court, E. D. Pennsylvania.  July 24, 1907.)

No. 44 of 1905.

SHIPPING—CHARTER PARTY—LIABILITY OF VESSEL FOR BROKER'S ATTENDANCE FEE.

> A vessel was chartered at Rio de Janeiro to carry a cargo of ore from that port to Philadelphia. The charter party provided that "the vessel to be consigned to charterer's agents at the port of discharge, paying usual commission not exceeding 2½ per cent. at this port." Such commission of 2½ per cent. was paid to the charterer before the vessel sailed. *Held*, that it was in effect an "address commission" which went to the charterer in reduction of freight, and did not cover the attendance fee of the agents at the port of discharge, which is a broker's fee for the transaction of the vessel's inward business at that port, and that, in the absence of agreement otherwise, they were entitled on rendering or tendering the service to collect such fee from the vessel at the customary rate.

In Admiralty.  Suit to recover balance of freight.

Henry R. Edmunds, for libelant.

H. Alan Dawson, for respondent.

J. B. McPHERSON, District Judge.  This suit was originally brought against the Carnegie Steel Company to recover the balance of freight due for carrying a cargo of manganese ore from Rio de Janeiro to the port of Philadelphia in the summer of 1905.  The whole balance having been paid over by the steel company to their agents, Peter Wright & Sons, by whom a part was retained to satisfy a disputed claim of their own against the ship, the agents were also made parties respondent under the analogy of the fifty-ninth rule, and have appeared and taken defense.  Since the suit was brought, the owner of the bark, who resides in Christiania, has, without objection so far as appears, accepted payment from Peter Wright & Sons of the freight, with interest, less the amount of the claim in controversy, and therefore it is this amount only for which the action is now urged.

The facts are few, and easily understood.  In June, 1905, Carlos Wigg, a merchant of Rio, chartered the bark in that port to carry a cargo of ore to Philadelphia, and deliver it in conformity with the bills of lading at a freight rate of 10 shillings sterling.  It was further provided that:

"The vessel (is) to be consigned to charterer's agents at the port of discharge, paying usual commission not exceeding 2½ per cent. at this port. What cash the master may require for the ship's ordinary disbursements at port of loading to be advanced by charterers, subject to 5 per cent. for all charges, and the balance of the freight to be paid on unloading and right delivery of the cargo, in cash at current rate of exchange on London."

The bills of lading called for delivery to the Carnegie Steel Company, "he or they paying freight for the same as per charter-party dated Rio de Janeiro 15th June 1905, and all clauses thereof," etc. Upon this bill was indorsed "Address commission paid here," and the fact is that the commission of $2\frac{1}{2}$ per cent. was duly paid (or settled for) in Rio to Carlos Wigg before the vessel sailed. Peter Wright & Sons had been the charterer's agents in Philadelphia for a number of years, and they were accordingly notified that the Lady Palmerston might be expected in due course, and that they should attend to the usual business required by the vessel in this port. The present difficulty would probably not have arisen if the master had not conceived the idea that the "usual commission not exceeding $2\frac{1}{2}$ per cent.," which was paid to the charterer, or settled for, at Rio, was intended to pay also for all services to be rendered at the port of discharge, and had not therefore declined to recognize the claim of Peter Wright & Sons to be paid a fee of 10 guineas for attendance upon the ship in Philadelphia, and the transaction of her inward business. The master evidently supposed that the "address commission" included pay for attendance and services at Philadelphia, but in this I think he was mistaken. The charter party makes no provision for the payment of these services. It has been proved to my entire satisfaction that the "usual commission not exceeding $2\frac{1}{2}$ per cent." is identical with the "address commission," and has nothing to do with the attendance fee which is charged by ship brokers for doing the business of the vessel. The "address commission" always goes to the charterer, or to his agent for him. It is paid sometimes at the port of loading and sometimes at the port of discharge, but, wherever paid, it is essentially a device to reduce the nominal rate of freight agreed upon in the charter. Usually it is $2\frac{1}{2}$ per cent., but the rate may differ as the parties agree. An "attendance fee," on the contrary, has nothing to do with the rate of freight. The charterer does not receive it—unless by special agreement—for he does not perform the services. It belongs to the broker to whose care the ship may be committed, whether by the charter itself, or by the master, if the charter is silent upon the subject.

In this case the charter provided that "the vessel (was) to be consigned to the charterer's agents at the port of discharge," and she was therefore put into the hands of Peter Wright & Sons (who were the charterer's agents in Philadelphia) by this express agreement of the parties. It is an awkward addition to the clause to say in that connection, "paying usual commission not exceeding $2\frac{1}{2}$ per cent. at this port," and the master may be pardoned for his erroneous construction of the sentence, taken as a whole. When it is considered, however, that the "usual commission" means the "address commission," and under either name is a disguised deduction from the freight, it is clear that the sentence deals with two distinct subjects. It provides in the first clause for the person or persons who shall look after the ship at the port of discharge, saying nothing about his pay, and it provides in the second clause for a specified deduction from the freight, to be paid at Rio to the charterer himself.

This leaves the amount of the broker's attendance fee to be fixed either by subsequent agreement, or by the custom of the port. As I have already stated, the charter put the vessel into the hands of Peter Wright & Sons, and the master should have recognized and acted upon the agreement. Acting upon his erroneous understanding, however, he refused to accept certain services at the hands of Peter Wright & Sons, although he did accept other services, and attempted to transfer the ship's business to another firm. There was no dispute concerning the amount of freight that was earned, and the steel company sent a check for what was due to Peter Wright & Sons, who were agents for the steel company as well as for the bark, and the balance, allowing for certain deductions that were admitted to be correct, and also for the disputed attendance fee, was tendered to the master, who declined it for the single reason that the fee had been improperly deducted. He thereupon sued the steel company, claiming that the payment should not have been made to Peter Wright & Sons, because they did not represent the ship and therefore had no authority to receive the freight; but, as already explained, the controversy has now taken such a shape as to involve nothing more than the attendance fee of 10 guineas that is still in the possession of the respondent firm.

In my opinon they had a right to retain it. The testimony shows clearly—in spite of a few dissenting, but I think mistaken, voices—that the customary attendance fee at the port of Philadelphia is 10 guineas, and that this fee is earned by the ship's agent if he offers his services and is ready to transact the ship's business, although the master may decline to accept him, and may employ a broker of his own. Of course, I am speaking of a case where a particular agent or broker has been agreed upon by the parties—here, for example, it was the "charterer's agents at the port of discharge"—for, if there is no such agreement, the master may employ whomsoever he will. The testimony shows, also, that nearly all of the Lady Palmerston's inward business was, in fact, attended to by Peter Wright & Sons. As one of the firm testified—and I find the facts to be so—

"I know that one of our clerks went down in a tug below the mouth of the Schuylkill and boarded the vessel, actually boarded the vessel, and delivered orders to that vessel to go into Girard Point, where a berth had been secured at which her cargo of ore was to be discharged, and where arrangements had been made with the Pennsylvania Railroad Company to have cars in readiness for her, to have that load weighed and everything ready to dispatch the vessel's cargo as soon as it could be unloaded from her. * * *

"In this particular instance I sent an account. I was cognizant of the different payments as made. The inward pilotage of the vessel, amounting to one hundred and some odd dollars was paid, the inward towage of the vessel was paid by us, and eventually the stevedore's bill, at the rates of discharge stipulated for in the charter party, was paid by us. The bills for pilotage and towage were signed by the captain. Without his approval we should not have paid them.

"Q. To whom was the cargo in this case consigned?

"A. To the Carnegie Steel Company.

"Q. Were you notified before the vessel arrived that you were the charterer's agents to attend to her business?

"A. Yes; on receipt of a copy of the charter party from Mr. Wigg, the cargo to be delivered to the Carnegie Steel Company.

"Q. Who collected the freight from the Carnegie Steel Company?

"A. Our usual course is we remit them a bill, and by return mail they send us a check.

"Q. Was that done in this case?

"A. That was done in this case, and I saw the check, handled the check.'

Further discussion seems to be unnecessary. The retention of the attendance fee by Peter Wright & Sons was justified by the charter and by the custom of the port, and, as the owner of the bark has received whatever else is due, the libelant is not entitled to recover.

A decree may be entered in favor of the respondents, with costs.